IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

ALICE LOGGINS HILL, as Administratrix
of the Estate of DEBBIE DENISE LOGGINS,
Deceased,                                                                              PLAINTIFF,

VS.                                                             CIVIL ACTION NO. 4:06CV104-P-B

CARROLL COUNTY, MISSISSIPPI; CARROLL
COUNTY SHERIFF'S DEPARTMENT, a
Division of Carroll County, Mississippi; DONALD
GRAY, in His Official Capacity as Sheriff of
Carroll County; MICHAEL SPELLMAN,
Individually and in His Official Capacity;
CHARLES JONES, Individually and in His
Official Capacity; and DAVID MIMS,
Individually and in His Official Capacity,                                  DEFENDANTS.

**MEMORANDUM OPINION**

This matter comes before the court upon Defendants Michael Spellman, Charles Jones, and David Mims' motion to dismiss, or alternatively for summary judgment, based on qualified immunity [9-1][1]. After due consideration of the motion and the responses filed thereto, the court is prepared to rule.

**I. FACTUAL BACKGROUND**

At 5:43 a.m. on September 17, 2005 the Carroll County Sheriff's Department received a report from Bill and Brenda Wood that under their carport there were two women unknown to them fighting. The sheriff's department dispatched Chief Deputy Michael Spellman and Deputy David Mims. Spellman was the first to arrive on the scene whereupon he observed two women fighting:

---

[1] Though the instant motion was filed as one to dismiss, the court has converted the motion into one for summary judgment pursuant to Fed. R. Civ. P. 12(b) since matters outside the pleadings were attached by both parties to their briefs.

1

Debbie Loggins and Patricia McChristian. Loggins had McChristian in a headlock under her right arm with her left hand free. Loggins was 33-year-old female who was five feet four inches tall and weighed approximately 220 lbs. Spellman advised each woman to put their hands up. Loggins raised her left arm but maintained the headlock with her other arm. Spellman then approached the women and attempted to take Loggins by the left hand to place her in handcuffs. It is undisputed that Loggins then began to assault Chief Deputy Spellman with his flashlight he had dropped, striking him on the head, arm, and shoulder with it. Spellman managed to place cuffs on Loggins' hands behind her back as she struggled with him.

It also undisputed that Loggins continued to kick, curse loudly, and to act irately. Spellman therefore placed a pair of restraints on Loggins' legs. Despite having her hands cuffed behind her back and her legs cuffed, Loggins continued to struggle with Spellman to such a degree that he could not place her in the back of his squad car.

When Deputy Mims arrived, they both worked together to placed Loggins in the squad car but she continued to resist and kick with both legs despite the leg and arm restraints. They could therefore not get her in the squad car. The officers then decided to connect the handcuffs and the leg restraints behind Loggins' back with another pair of handcuffs, thereby connecting her hands to her feet behind her back. After doing so, they were able to place Loggins in the squad car despite her continued efforts to struggle.

Mims drove his vehicle with Loggins in the rear, and Spellman followed in his own vehicle, to the courthouse at the town square of Carrollton. The officers then transferred Loggins to a squad car driven by Deputy Charles Jones. She continued to struggle with the three officers as they placed her on her stomach in the rear seat. Jones avers that after she was inside, she continued to struggle

so greatly that the vehicle shook back and forth. Jones then drove Loggins from Carrollton to the Grenada County Jail, some 29 miles away. No one else rode in the vehicle. Jones avers:

> About half way between Winona and Grenada, or a third of the way through the trip, I observed Ms. Loggins in the back seat finally quiet down. Though she was finally quiet, I did observe her moving through the entire ride. I monitored the arrestee during the entire trip observing movement and listening to her shouts. When I arrived at the Grenada County Jail, I observed the arrestee was apparently moving. I went to the security door and asked for the assistance from the jailers at moving Ms. Loggins from the patrol car to the jail.

Affidavit of Charles Jones, ¶¶ 4-5.

Once at the jail, one of the jailers determined that Loggins had no pulse. The jailers then administered CPR until the EMTs arrived whereupon they transported her to the hospital. The ER physician pronounced her dead about 20 minutes later. The medical records from the emergency room note that Loggins' body temperature was 107.5 degrees Fahrenheit. The Final Report of Autopsy conducted by Steven T. Hayne, M.D. concluded that the cause of death was hyperthermia (advanced heat stroke). Dr. Hayne also concluded that the underlying cause of death was "[e]xcessive exertional activity with changes of physical exhaustion" and that the manner of death was accidental.

On June 19, 2006 Alice Loggins Hill, the Administratrix of the Estate of Debbie Loggins, Deceased, filed the instant 42 U.S.C. § 1983 action against Carroll County, Mississippi; the Carroll County Sheriff's Department; Donald Gray, the Sheriff of Carroll County, and the three officers, Spellman, Mims, and Jones. The plaintiff alleges that the defendants violated Loggins' Fourth Amendment rights against unreasonable seizure by illegally "hog-tying" Loggins which was, she argues, the true cause of her death. The plaintiff alleges that hog-tying Loggins and placing her on her stomach in the back of the squad car caused fatal positional asphyxia. The plaintiff does not

allege that any of the officers struck or otherwise injured Loggins.

Officers Spellman, Mims, and Jones have filed the instant motion to dismiss, or for summary judgment, based on the defense of qualified immunity. The officers argue that the four-point restraint of Loggins was necessary given her constant violence and resistance of arrest and that doing so did not violate any of her rights. Furthermore, they argue that even if they violated a clearly established right, their behavior was objectively reasonable since there was no other way available to them to restrain and transport Loggins.

The plaintiff counters that it was the way in which the officers seized Loggins that violated her Fourth Amendment right against unreasonable seizures given that they did not monitor her closely throughout the 30-mile car ride to the Grenada County jail. The plaintiff contends that the officers' use of the hog-tie was objectively unreasonable because a 1991 San Diego Task Force Study, which was allegedly sent to all police departments in the country, demonstrated that hog-tying detainees has been linked to several other deaths. The plaintiff has also retained an expert, Dr. Werner U. Spitz, who has opined that the manner of death was not hyperthermia, but rather positional asphyxia.

The defendants contend that the San Diego study, conducted by Donald T. Reay, et al., was specifically "eviscerated" by the study conducted by Tom Neuman, et al.., who convinced Reay to concede that hog-tying was "physiologically neutral" in the case of *Price v. San Diego*, 990 F.Supp. 1230 (S.D. Cal. 1998).

Both parties rely on the Fifth Circuit opinion in *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998) in support of their arguments.

4

## II. DISCUSSION

### A. Summary Judgment

Summary judgment should be entered only if "[t]here is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the initial burden of demonstrating through the evidentiary materials that there is no actual dispute as to any material fact in the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In determining whether this burden has been met, the court should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id*. Furthermore, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The summary judgment procedure does not authorize trial by affidavit. Rather, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. Accordingly, a court may not decide any factual issues found in the record on motion for summary judgment, but if such material issues are present, the court must deny the motion and proceed to trial. *Impossible Elec. Tech. v. Wackenhut Protection*

*Systems*, 669 F.2d 1026, 1031 (5th Cir. 1982); *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981); *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).

Under the provisions of Federal Rule of Civil Procedure 56(e), a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

Summary judgment is not proper if a dispute about a material fact is "genuine," or in other words the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. There is no such issue unless the evidence sufficiently supports the non-moving party's version of the facts for a jury to return a verdict in the non-moving party's favor. *Id*. at 249. The relevant inquiry is whether or not there is sufficient disagreement on the facts to submit them to the jury or whether it is so one-sided that one party should prevail as a matter of law. *Id*. at 251. The issue must be genuine, and not pretended, and the evidence relied on to create such an issue must be substantial. *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 826 (5th Cir. 1978).

### B. Qualified Immunity

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' The privilege is 'an immunity from suit rather than a mere defense to liability and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity shields an officer from suit when [he] makes a decision that, even if

constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Brousseau v. Haugen*, 543 U.S. 194, 197 (2004).

In ruling upon an assertion of qualified immunity, the court must first consider the question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If not, "the officer is entitled to qualified immunity, and we need not consider whether the asserted right was 'clearly established.'" *Chavez v. Martinez*, 538 U.S. 760, 766 (2003). If so, then the court is to "examine the objective reasonableness of the official's conduct under the circumstances, 'in light of clearly established law and the information the ... officers possessed.'" *Gutierrez v. City of San Antonio*, 139 F.3d 441, 445 (5th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

1. Whether the Officer's Conduct Violated a Constitutional Right

With regard to the first step – determining whether the officer's conduct violated a constitutional right – the Supreme Court wrote:

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.
>
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable

7

*Saucier*, 533 U.S. at 201.

The constitutional right at issue in this case is the Fourth Amendment right against unreasonable seizures by the police. "Whether a seizure is reasonable under the Fourth Amendment depends not only upon whether the seizure itself is reasonable, but also upon how the police seize the individual or item." *Gutierrez*, 139 F.3d at 446 (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)).

Regarding the case at bar, Debbie Loggins did indeed possess the Fourth Amendment right against unreasonable seizures in the form of excessive force. Taken in a light most favorable to the plaintiff – *i.e.*, by assuming that the officers placed Loggins on her stomach in the rear of the squad car while hog-tied, that they did not reasonably monitor Loggins during the 29-mile drive to the jail, that they were on notice that doing so posed a substantial risk of serious bodily harm or death, *and* that such factors did in fact cause her death (as opposed to hyperthermia) – the court concludes that the officers conduct, if the plaintiff's allegations are true, violated Loggins' Fourth Amendment right against an unreasonable seizure since Loggins did in fact die.

2. Whether the Officers' Conduct Was Objectively Reasonable in Light of Clearly Established Law

Having concluded that Loggins' Fourth Amendment right against unreasonable seizure was violated if the plaintiff's allegations are taken as true, the next inquiry is whether the officers' conduct was objectively reasonable in light of clearly established law and the information the officers possessed. From this question arises two inquiries: (1) whether there was clearly established law or other information at the time in question that hog-tying a suspect, placing her in a prone position in the back of a squad car for at least thirty minutes, and not closely monitoring her would cause serious

bodily injury or death; and (2) in light of that answer, whether the officers' conduct in doing so objectively reasonable.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. ... If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."). However:

> This is not to say that the formulation of a general rule is beside the point, nor is it to insist the courts must have agreed upon the precise formulation of the standard. Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard.
>
> \*\*\*
>
> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier*, 533 U.S. at 202-03, 205.

Having researched the matter, it is not at all abundantly clear that hog-tying a suspect is *per se* excessive force running afoul of the Fourth Amendment. It is undisputed that there is an absence of clear U.S. Supreme Court authority. The only case regarding hog-tying from the Fifth Circuit is

9

*Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998). Both parties argue that the decision in *Gutierrez* establishes their respective positions.

In *Gutierrez*, two officers stopped Gutierrez after observing him wandering around in the middle of a busy intersection wearing nothing but a pair of trousers. They determined that he was on drugs, he having admitted he had "shot some bad coke." Rather than deciding to arrest him, the officers called an ambulance to help take Gutierrez to the hospital. It was not until the EMT tried to placed Gutierrez in the ambulance that Gutierrez began to struggle. The two officers hog-tied Gutierrez after he kicked the EMT in the chest and, after he was placed inside the squad car, began kicking the back of the driver's seat, the metal cage, and the windows of the squad car with his bare feet.

It was disputed whether or not the officers placed Gutierrez on his stomach in the back seat while hog-tied, but by the time they arrived at the hospital some ten minutes later, Gutierrez was face down on the seat and the medical personnel determined that Gutierrez had died. The autopsy report initially indicated that Gutierrez died from a lethal combination of narcotics. When the examiner learned of the hog-tying, the report was amended to include the hog-tying as a contributory cause of death because "[i]t is known that 'hog-tying' of an individual and placing them in the position that Rene Gutierrez was placed, can produce a relative hypoxia and in some instances death." *Id*. at 444.

The plaintiffs in *Gutierrez* sued the officers under § 1983 for violating Gutierrez's Fourth Amendment right against unreasonable seizure. They relied heavily on the 1991 San Diego Task Force Study conducted by Donald T. Reay indicating that the combination of hog-tying a drug-affected person in cocaine psychosis and positional asphyxia (placing them in a face-down prone position) can lead to death and an article entitled "Sudden Custody Death Syndrome: The Role of

Hogtying," that appeared in the fall 1994 issue of Criminal Law Update.

Ultimately, the Fifth Circuit concluded in *Gutierrez* that the officers could not establish qualified immunity because of several material issues of fact, including: (1) whether a reasonable officer would have known of the first causal factor of Sudden Custody Death Syndrome; (2) whether the officers in fact placed Gutierrez in a prone position; (3) whether the San Antonio Police Department warned its officers of the possible dangers of hog-tying prior to the event in question (when it was alleged that the day after the incident, the SAPD sent out a memo "reminding" the officers not to hog-tie); and (4) whether Gutierrez posed a threat of death or serious bodily injury to the officers or others.

The Fifth Circuit's holding, however, was "very limited": "Both the San Diego Study and Criminal Law Update article suggest hog-tying may present a substantial risk of death or serious bodily harm only in a limited set of circumstances – *i.e.*, when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." *Gutierrez*, 139 F.3d at 451.

In *Wagner v. Bay City, Texas*, 227 F.3d 316 (2000) the Fifth Circuit noted "that while there were no cases that held [hog-tying] unlawful," the San Diego Study concluded that death could be caused by the presence of all four factors: "(1) drug use, (2) positional asphyxia, (3) cocaine psychosis, and (4) hog-tying ...." *Id*. at 323. In *Wagner*, the Fifth Circuit clearly indicated that all four factors were required and that the person in question in that case was not a drug user, nor was he in cocaine psychosis, nor was he hog-tied. *Id*. at 323-24.

In any event, it is not a given that the San Diego Study is correct. The Fifth Circuit in *Gutierrez* noted that Reay's conclusions have been called into serious question by Dr. Tom Neuman in *Price v. San Diego*, 990 F.Supp. 1230 (S.D. Cal. 1998). *Gutierrez*, 139 F.3d at 451. More

11

specifically, the Court observed:

> [I]n *Price v. San Diego,* 990 F.Supp. 1230 (S.D.Cal.1998), a drug-affected arrestee died in police custody after an intense struggle that concluded with the police hog-tying him and placing him in a face-down position. The plaintiffs in that case relied on the San Diego Study and the research of Dr. Donald T. Reay, as does Gutierrez's family in this case. The district court noted that a recent study calls the validity of Dr. Reay's research into question. *See* Tom Neuman et al., *Restraint Position and Positional Asphyxia,* 30 Annals of Emergency Med. 578 (1997). The court further noted that the persuasiveness of Dr. Neuman's study led even Dr. Reay to concede that hog-tying is "physiologically neutral."Id. at 1238-39. Accordingly, the district court dismissed all excessive force claims against the officers because "little evidence is left that suggests that the hogtie restraint can cause asphyxia." *Id.* at 1238.

Because Neuman's study was not party of the record in *Gutierrez*, the Court did not consider it in determining whether the officers' behavior was objectively reasonable. *Id*.

The defendants in this case, however, have cited *Price* for the proposition that Neuman's study "eviscerated" the San Diego Study, thereby calling into question the primary basis of the plaintiff's case.

The court concludes that even though the officers' behavior would have violated Loggins' Fourth Amendment right against unreasonable seizures assuming the veracity of the plaintiff's allegations, a right against hog-tying in the manner used by the officers in this case was not clearly established.

Furthermore, the court concludes that the officers' behavior in this case was objectively reasonable in light of the lack of clearly established law prohibiting hog-tying in the circumstances at issue. It is undisputed that Loggins was not a drug user, nor was she in a "cocaine psychosis." Therefore, the plaintiff cannot establish the first and third of the four factors cited by the San Diego Study, assuming the study is valid. It is also undisputed that Loggins violently resisted arrest. She beat Officer Spellman with his flashlight. Two male officers could not get Loggins, a 220 pound

woman, in the rear of the squad car even though her hands were cuffed behind her back. Nor could they get her inside when they cuffed her feet. She continued to kick with both legs since even legs that are cuffed together can kick if done at the same time. Not until they attached her arms to her legs with an additional pair of handcuffs behind her back could these two officers get her in the rear of the squad car to take her to the jail. It is also undisputed that when they moved her to a different vehicle she continued to struggle enough to make the vehicle shake.

What is more, there is no evidence that the officers were ever on notice that hog-tying posed a serious danger of substantial bodily harm or death. While the Fifth Circuit noted in *Gutierrez* that "San Diego mailed copies of the San Diego Study to police departments around the nation ... in 1992," there is no evidence in this case that the Carroll County Sheriff's Department received a copy – which would have been over fourteen years ago. More importantly, even if they did receive a copy, a study is not "clearly established *law*."

It must be remembered that the court should not use "the 20/20 vision of hindsight," and it should "consider 'the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.' Thus, '[e]ven law enforcement officials who "reasonably but mistakenly" [use excessive force] are entitled to immunity.'" *Gutierrez*, 139 F.3d at 447.

Finally, this court notes that the question of whether the officers' behavior was objectively reasonable is a question of law for the court, not one of fact for the jury, since the qualified immunity test is designed for the court to utilize before trial. If the question were one of fact, then the purpose of the qualified immunity doctrine – *i.e.*, to create "an entitlement not to stand trial or face the other burdens of litigation" – would be thwarted since the officers would have to stand trial to determine

whether their behavior was objectively reasonable.

## III. CONCLUSION

For the reasons discussed above, Defendants Michael Spellman, Charles Jones, and David Mims' motion to dismiss, or alternatively for summary judgment, based on qualified immunity [9-1] should be granted because even if the plaintiff's factual allegations were true, the officers behavior was objectively reasonable in light of the lack of clearly established law proscribing their method of restraining a violent suspect. Accordingly, and Order shall issue forthwith, dismissing the plaintiff's claims against the officers in their individual capacities,

**THIS DAY** of December 28, 2006.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE